FILED

NOV 1 7 2006

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS PRECIADO, | No. C 05-1866 CRB (PR) |
| Petitioner, | |
| vs. | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| RICHARD KIRKLAND, Warden, | |
| Respondent. | (Doc # 18) |

| | |
|---|---|
| RAFAEL PRECIADO, | No. C 05-2508 CRB (PR) |
| Petitioner, | |
| vs. | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| D.L. RUNNELS, Warden, | |
| Respondent. | |

In 2002, after a joint jury trial in the Superior Court of the State of California in and for the County of Santa Clara, petitioners Rafael Preciado ("Rafael") and Jesus Preciado ("Jesus") (together, "Petitioners") were found guilty of several violent crimes involving the use of firearms. Rafael was convicted of first degree murder and Jesus of second degree murder, each with personal use of a firearm for killing the same victim, Fernando Reyes ("Reyes"). They were also both convicted of attempting to murder another victim, Joe

Herrera ("Herrera"), in which Jesus intentionally and personally discharged a firearm, resulting in great bodily injury. Rafael alone was convicted of a separate assault with a deadly weapon on an unidentified victim. As evidenced by their convictions, the jury rejected Petitioners' claim of imperfect self-defense that they held an honest, albeit unreasonable, belief that Reyes was threatening to attack them. Rafael was sentenced to a total term of 80 years to life; Jesus was sentenced to a total term of 67 years to life.

The California Court of Appeal affirmed Petitioners' convictions on May 10, 2004, and on August 11, 2004, the California Supreme Court denied their petitions for review.

Petitioners filed separate petitions for writs of habeas corpus under 28 U.S.C. § 2254. Per Civil Local Rule 3-12, the petitions were deemed related and assigned to the undersigned. Rafael claims in his petition that there was insufficient evidence to support findings that the murder and attempted murder were willful, deliberate and premeditated, and that there was insufficient evidence to support a finding that he aided and abetted the attempted murder. Additionally, both Rafael and Jesus claim that the state trial court erred in excluding evidence that Reyes was a gang member and had in the past threatened to kill his ex-girlfriend. Per orders filed on July 27, 2005, and October 18, 2005, the Court found that Petitioners' petitions, liberally construed, stated cognizable claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondents have filed answers to the orders to show cause and Petitioners have filed traverses.

## FACTUAL BACKGROUND

The California Court of Appeal related the facts of the case as follows:

*Incidents Before the Murder and Attempted Murder*

2

1

2

3

4

5

6

7

8

9

10

11

12

On September 25, 2000, at around 11:00 p.m., Rafael and his friend Mario were walking near the intersection of Lochner Drive and Candler Avenue in San Jose, an area Rafael considered a Norteño neighborhood.[1] Rafael had his .45-caliber, semi-automatic handgun, and Mario had a nine-millimeter, semi-automatic handgun, which Rafael had loaned him but which belonged to Jesus. At one point, Rafael and Mario walked past Miguel Rubio, who was also on the street. One of them called Rubio a "chapete," and they kept on walking. Rubio did not know what chapete meant but took it as an insult.[2] He was scared and thought they were looking for trouble. Later, he saw them encounter people in a reddish pickup truck. Either Rafael or Mario had a tire iron or crow bar. They said "L.A." and the Sureño phrase "puro sur." When a passenger in the back of the truck stood up and raised both hands in the air, Rafael and Mario started shooting at him. According to Rubio, no one from the truck fired a gun.

13

14

15

16

17

18

19

[1] According to Rafael, a Norteño "[is] a person who belongs to the Norteños," who "wear[] red and use[] the number 14 and claim San Jose as their territory. He said that a Sureño is a person from Mexico, who "wears blue and uses the number 13." Norteños are not welcome in Sureño neighborhoods. Rafael said he was a member of a Sureño criminal street gang called Varrio Gramercy Locos. He said he joined the gang to protect himself from Norteños, who had insulted and attacked him on numerous occasions.

20

21

22

23

24

25

26

27

[2] Rubio testified that a Sureño was someone from the south and a Norteño was someone from the north. According to Rafael, a Norteño "[is] a person who belongs to the Norteños," who "wear[] red and use[] the number 14" and claim San Jose as their territory. He said that a Sureño is a person from Mexico, who "wears blue and uses the number 13." Norteños are not welcome in Sureño neighborhoods. Rafael said he was a member of a Sureño criminal street gang called Varrio Gramercy Locos. He said he joined the gang to protect himself from Norteños, who had insulted and attacked him on numerous occasions.

28

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Guadelupe Arias also witnessed the shooting. He heard someone ask, "Sureños or Norteños?" There was shouting from the truck, and then Rafael and Mario started shooting. Maria Garcia, Rafael's girlfriend at that time, lived in the area and heard the shooting. Rafael later told her he had had trouble with some Norteños in a truck and had shot at them.

Rafael testified that when he and Mario saw the truck, someone in it asked, "Sureños or Norteños?" Someone else said "scrapa," which Rafael said was a word Norteños say before they attack Sureños. Rafael then saw a shiny object and thought he heard a gunshot, and he and Mario started shooting back. Rafael said that Mario used Jesus's gun, which Jesus often kept in Rafael's apartment. Rafael admitted that he lied to police about being alone that night.

Maria Garcia testified that about a month later on October 24, 2000, she and some friends were standing outside their school when some women and men in two vehicles drove by and started yelling vulgar insults, including "scrapa" at them.[3] She reported the incident to a police officer at school. Later, when she was walking home she encountered the same group, and again they yelled at her. Garcia told Rafael about the incident and said she had seen the vehicles in a certain area recently. Rafael offered her a nine-millimeter handgun. When she declined, he said, "I'll take care of those Norteños for you."

A few days later, on October 28, 2000, Rafael and Jesus armed themselves with guns and went out to find the Norteños who had harassed Garcia. At around 9:00 p.m., they confronted Gilbert Rosillo, who was on his porch talking on the phone. Rafael uttered a Sureño gang slogan at him and said, "Do you have a problem

----

[3] Garcia testified that "scrapa" is "an insult from Mexicans to those who are not Mexicans" and "chapete" is an insulting name Sureños use for Norteños. According to Garcia, a Norteño is person who was born in the United States or has always been here. A Sureño is a Mexican and a person who predominantly speaks Spanish.

4

with me?" Rosillo saw Jesus holding something next to his body, which he thought was a gun or a telephone. Rafael then asked Rosillo, "What do you claim" and "What do you represent." Rosillo kept talking on the phone, and Rafael called him a "puto," which means bitch or whore. At that point, Rosillo went inside and came back out with his uncle Aaron Chavira and his friend Marcos Guerra. Chavira asked if there was a problem. Rafael identified himself as a Sureño, pointed to Rosillo, and in an angry voice said, "That puto over there" and "Where is that puto from?" Around this time, Rosillo's grandmother drove up, got out of her car, and asked what was happening. Rafael and Jesus then ran off.

Rafael testified that when he and Jesus approached Rosillo, he heard someone say "scrapas." He then asked Rosillo, "What do you claim?" Later Chavira came out, and after speaking for a while, he realized that Rosillo was not a Norteño, so he and Jesus ran off. Rafael said that he later figured that no one had called them "scrapas" and that he must have been hearing things. Jesus denied having a gun with him at that time.

*The Murder and Attempted Murder*

The next evening, October 29, 2000, Fernando Reyes drove over to his nephew David Griego's house to show David the motorcycle he had received as a birthday present. Joe Herrera followed Reyes in his car and then parked in the driveway, partially blocking the sidewalk. He stayed in his car, listening to music fairly loud with the windows somewhat lowered. Reyes drove his motorcycle up and down the block a few times and then parked on the sidewalk. While he and David were talking near the back of Herrera's car, Rafael and Jesus came walking up. As they passed, David heard one of the men say something in Spanish in a low voice that made him fearful. Reyes said something back and stepped toward them. David later told police that Reyes had said, "You think you're hard?" David testified that one of the men pulled something from his waist. He heard a gun being cocked. He then heard gunshots and saw Reyes lift his arms and step backward. David heard more shots and ran into his house.

Herrera, who was inside his car, saw Rafael and Jesus approach and then stop behind his car. He heard a noise, and when he looked

5

1

2

3

4

back, he saw Rafael draw a gun and start shooting Reyes. When Herrera reached for the door, Jesus started shooting at him. Herrera dove to the floorboard, heard numerous shots, and felt hot punches to his back. When the shooting stopped, Herrera crawled from his car, fell near Reyes, and called out to him. Reyes did not respond.

5

6

7

8

Diane Griego, David's mother, testified that from inside the house she saw flashes and heard gunshots. When she came out, a man was moving around Herrera's car and shooting into it. The person stopped for a few second and then continued firing at Herrera, who was on the ground. Griego also heard and saw flashes coming from behind the car, but she did not see another shooter.

9

10

11

12

13

Rufio Paz and his wife were driving down the street, when he saw two people near the sidewalk and numerous flashes of light associated with them. Paz told police that one of the men on the sidewalk had been shooting into a car as he walked around it; the other had been shooting at someone on the ground. Moments later they ran away. Paz saw one person lying on the ground and another leaning against the tire of a car.

14

15

16

17

Christine Smythe heard shooting and saw a man near the sidewalk backing up and firing his gun several times toward the ground. One man was already on the ground, and another man fell on top of him. She then saw two men flee down the street.

18

19

20

21

Reyes suffered between 11 and 15 bullet wounds, two of which would have caused death within minutes. Some of the wounds appeared to be defensive and indicated that Reyes was on the ground when he was shot. There were multiple gunshot wounds to his genitals. Herrera suffered non-fatal gunshot wounds to his back and leg.

22

23

24

25

26

During their investigation, police recovered a .45-caliber Norinco pistol and a nine-millimeter Beretta from Rafael. They recovered a box of .45-caliber ammunition from Jesus. A ballistics expert testified that the .45-caliber and nine-millimeter shell casings found at the scenes of the shootings on September 25 and October 29, 2000, were from bullets fired from the two guns.

27

28

6

*The Defense to the Murder and Attempted Murder*

As noted, Rafael testified that he joined a Sureño gang and armed himself to protect himself from Norteños, who had insulted, threatened, and attacked him on numerous occasions because he lived in a Norteño neighborhood. He, in turn, fought Norteños whenever they came into his gang's territory. He said that sometimes he and fellow gang members would start fights with Norteños, asking where they were from and assaulting them if they said they were Norteños. He said he thought about Norteños constantly and had nightmares about being chased and knifed.

Rafael said that on October 29, 2000, he ate dinner at a restaurant with his uncle, Jesus, and another friend. He drank beer and snorted some cocaine. After dinner, he asked Jesus to go with him to visit Maria Garcia. However, this was a ruse to get Jesus to help him look for the Norteños who had harassed Garcia. Both Rafael and Jesus were armed, and Rafael admitted he was ready to use his gun if necessary.

Rafael said that in the course of their search, they encountered a group of people near a car that was blocking the sidewalk. One said in an angry tone, "What? Do you think you're hard?" The man then suddenly stepped toward him and said, "Puto scrapa, I'm going to kill you" a couple of times. Rafael suspected he was about to be attacked by a Norteño. He then saw the man lift his shirt and move his hand toward his stomach . Thinking the man had a weapon, Rafael drew his gun and emptied it at the man. He admitted that he never saw a gun. He also said he may have continued to shoot the man after he was on the ground. When he and Jesus stopped shooting, they fled, and he hid his gun.

Rafael, who had a prior felony conviction for auto theft, admitted that after his arrest, he repeatedly lied to police and fabricated stories because he thought it would help him. In particular, he made up two stories about his gun. First, he said he found it in a creek days after the shooting. Later, he said some fictitious person owed him money and gave the gun to him. He also lied about not having

7

1

2

another gun and ammunition in his apartment, not being a gang member, not having tattoos, and not having a gang nickname.[4]

3

4

5

6

7

8

9

10

11

Rafael also lied about his whereabouts at the time of the shooting, saying he was asleep at home. After admitting his presence, he made up a story about an incident at the restaurant. He said that Reyes came up to him there, called him "Scrapa," and said, "I'm going to kill you pinche puto, puto." Rafael told police he left the restaurant to look for a fictitious friend named Jennifer. Later, he falsely told police that Garcia complained about being threatened with a gun, attacked, and beaten by Norteños. Rafael did not admit to police that he went looking for those Norteños. Ultimately, he said he was defending his girlfriend Garcia. However, she was not his girlfriend at the time. He made up a story about falling down before the shooting and said he fired his gun only to scare Reyes. Rafael did not tell police that Jesus had been there with him. And he lied to police about where he went after the shooting.

12

13

14

15

16

17

18

Doctor Jose Silva, a forensic psychiatrist, gave psychological tests to Rafael, who had reported various experiences, which Dr. Silva considered to be as traumatic events, traumatic nightmares, flashbacks, dissociative phenomena, intense psychological distress, hyper-vigilance, and exaggerated startle responses. He opined that Rafael suffered from post-traumatic stress disorder, which made it more likely that he would overreact to a perceived threat. Dr. Silva further concluded that Rafael suffered from this disorder for months before October 29, 2000.

19

20

21

22

23

24

Reyes's father Fernando Reyes, Sr., told police that his son liked to fight and would not back down if provoked. Dolores Calsadillas, Reyes's ex-girlfriend, testified that Reyes was a verbally aggressive, verbally abusive, and violent man, who liked to fight. Herrera told police that Reyes had a temper if he got on your bad side and would not take anything from anybody.

Jesus denied being a gang member. He said he bought a nine-

25

26

27

[4] Rafael has three dots and the number 13 tattooed on his hand and fingers, which indicate his Sureño gang affiliation. His gang name is "Gato."

28

8

1

2

3

4

millimeter gun for protection and carried it when he got paid and had cash on him. Other times, he left it with Rafael. He denied being involved in the truck shooting incident on September 25, 2000. However, he admitted he lied to police about not knowing what had happened.

5

6

7

8

Jesus testified that he was with Rafael on October 28, 2000, walking through the streets of an unfamiliar neighborhood, when Rafael confronted Rosillo. However, he did not understand anything because he does not speak English. He denied having his gun that night.

9

10

11

12

13

14

15

16

17

18

19

Jesus admitted having his gun the next day. After eating with Rafael, their uncle, and his friend, Jesus and Rafael . . . went into an unfamiliar area, where they encountered four men near a motorcycle. As he and Rafael walked by, the men said something in English, which he did not understand. Rafael answered back. Then one of the men threw something at them and started following them. In Spanish, Jesus said they did not want any problems. However, the men made angry comments, including "Puto escrapa." Jesus asked Rafael what they said, and Rafael told him they said they were going to kill them. Jesus then saw the men moving their hands. He kept walking until he heard some gunshots. Without knowing who was shooting, he drew his gun and started shooting "crazily" to defend himself. When he saw the person in the car duck down, he ran around the car shooting into it until his gun was empty. He said he thought the man was looking for a weapon. He did not know whether he shot at a man who was on the ground. He then fled to Rafael's apartment and hid his gun there.

20

21

22

Jesus admitted he lied to police about one of the men having a bat and about firing his gun only at the ground. He also falsely reported that one of the men had broken the headlights on his uncle's car.

23

24

25

People v. Preciado, No. H024362, 2004 Cal. App. Unpub. LEXIS 4588 at **2-14 (Cal. Ct. App. May 10, 2004) (footnotes in original).

26

27

28

9

# DISCUSSION

## Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state

10

court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## Claims & Analysis

Petitioners assert five separate claims for relief under § 2254. Rafael argues that there was insufficient evidence to support a finding that the murder of Reyes was willful, premeditated, and deliberate. Similarly, Rafael argues that there was insufficient evidence to convict him of deliberate and premeditated attempted murder of Herrera because there was no evidence that he acted with the intent to help Jesus shoot Herrera. Jesus argues that the trial court erred in excluding certain hearsay statements regarding Reyes' gang affiliation. Jesus also argues that the trial court erred in excluding specific prior threats Reyes made to Calsadillas which tended to show his violent character. Finally, Petitioners jointly argue that the trial court's exclusion of evidence of Reyes' gang affiliation rendered their trial fundamentally unfair, unduly inhibited their ability to assert their defense of imperfect self-defense, and amounted to a violation of due process.

### 1. Insufficient Evidence

The relevant inquiry on review of a constitutional challenge to the sufficiency of the evidence to support a criminal conviction is "whether, after

11

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. Id. at 324.

The reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

In light of 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson to the facts of the case. Id. at 1275. A writ may be granted only if the state court's application of the Jackson standard was "objectively unreasonable." Id.

### a. Murder

The California Court of Appeal considered Rafael's claim that there was insufficient evidence to support his conviction for first degree murder under Jackson v. Virginia. The court properly described the Jackson standard that governed its analysis:

> When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we determine whether there is substantial evidence – evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. In making this determination, we review the whole record in the light most favorable to the judgment, we draw all reasonable inferences from the evidence that support it, and we presume the existence of every

12

> fact the trier of fact could reasonably deduce from the evidence.
> Conversely, we do not reweigh the evidence, resolve conflicts in
> the evidence, or reevaluate the credibility of witnesses.

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at *15 (citing Jackson

and California cases). After carefully considering the evidence in the record, the

court concluded that a reasonable trier of fact could find Rafael guilty of first

degree murder beyond a reasonable doubt. See id. at **19-20.

In rejecting Rafael's claim, the court of appeal looked to People v.

Anderson, 70 Cal. 2d 15 (1968), for guidance to help assess sufficiency of

evidence concerning premeditation and deliberation. In Anderson, the California

Supreme Court listed three relevant categories of evidence–planning, motive, and

manner of killing. 70 Cal. 2d at 26-27. Considering these categories, the court of

appeal found that the record was not such that no rational trier of fact could find

that Rafael's attack on Reyes was premeditated and deliberate. People v.

Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at *17; accord Jackson, 443 U.S.

at 319. In fact, far from being devoid of such evidence, the court found that the

record contained ample evidence to support such a finding. Id. The court

explained:

> According to Rafael, the evidence showed that he carried a gun
> only for protection against Norteños, and although he was
> searching for the Norteños who bothered Garcia, he intended only
> to tell them to stop. He says the evidence further shows that the
> shooting was simply a sudden, rash, and impulsive reaction to
> Reyes's provocative movements and not a premeditated act. Noting
> that he inflicted many non-fatal wounds, he argues that the manner
> of killing – unlike, for example, an execution – was not so
> particular and exacting as to indicate premeditation. We are
> unpersuaded.
>
> Rafael views the evidence in the light most favorable to him. As
> noted above, however, we must view the evidence in the light most
> favorable to the judgment. The jury rejected the claim that Rafael

13

believed he needed to defend himself against Reyes and the evidence on which that claim was based. Moreover, using the <u>Anderson</u> guide, we find substantial evidence to support the jury's finding of premeditation and deliberation.

First we note that defendant offered Maria Garcia a gun, and when she declined to take it, he said he would "take care of those Norteños" for her. On October 28, 2000, he and Jesus, both armed, went out looking for those Norteños. Rafael was aggressive and instigated a confrontation with Rosillo and his uncle, calling Rosillo names and proclaiming his status as a Sureño.[5] The very next night, braced with alcohol and cocaine, Rafael resumed his hunt for those Norteños with Jesus. Rafael admitted that he was ready to use his gun if necessary. These facts reasonably support an inference of advanced planning and premeditation. (<u>Cf.</u> <u>People v. Steele</u>, supra, 27 Cal.4th at p. 1250 [bringing weapon]; <u>People v. Williams</u> (1995) 40 Cal.App.4th 446, 455 [bringing a loaded weapon]; <u>People v. Herrera</u> (1999) 70 Cal.App.4th 1456, 1463 [gang animosity].)

Next, Rafael testified about being insulted and attacked by Norteños in the past. He joined a Sureño gang. He attacked people if they claimed to be Norteños. And in the weeks before October 29, 2000, he was verbally aggressive toward suspected Norteños and shot at a truck full of them. This evidence supports a finding that Rafael harbored a deep, visceral hatred for Norteños. Moreover, his knowledge about Garcia being harassed, his offer to "take care of those Norteños," and his armed search for them with Jesus as backup further support a finding that Rafael's general hatred became inflamed and very focused before October 29, 2000, and on that date he had strong motives – revenge and retaliation – to kill Reyes after encountering him.

Last, the manner of the killing reasonably supports an inference of premeditation and deliberation. Rafael fired all of the bullets in his gun at Reyes, starting, according to David Griego, when Reyes was only four feet way. Reyes suffered between 11 and 15 gunshot

---

[5] Although Jesus denied being armed, Rosillo testified that he saw Jesus holding something in his hand, which he thought was a gun or a telephone.

wounds. There was evidence that Reyes was on the ground trying to defend himself when some of the shots were fired, and Rafael said he may have continued shooting after Reyes was down. Reyes also had gunshot wounds to his genitals. Contrary to Rafael's view, the jury could find that he killed Reyes in a cruel and exacting way that was certain to cause death. (Cf. People v. Orozco (1993) 20 Cal.App.4th 1554, 1567 [shooting with machine gun shows premeditation].)

In sum, the jury could reasonably conclude that on the evening of October 29, 2000, Rafael went out with Jesus to hunt down some Norteños and shoot them. That the evidence may be susceptible of a more innocent interpretation is irrelevant.

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at *16-20 (footnote in original, footnote number altered).

Because the court of appeal identified the correct legal standard articulated by Jackson, and because its application of that standard was not objectively unreasonable, Rafael's challenge to the sufficiency of evidence supporting his first degree murder conviction must be rejected. See 28 U.S.C. § 2254(d). The state appellate court reasonably determined that there was ample evidence to support the jury's finding that Rafael deliberately and with premeditation shot and killed Reyes. Given Rafael's general hatred for Norteños, his motive and intent that night to confront Norteños, his stated willingness to use the gun he had brought with him, and the brutal manner in which he shot the victim, it cannot be said that no rational trier of fact could have found proof of guilt beyond a reasonable doubt to support his conviction for first-degree murder. See Jackson, 443 U.S. at 319. Rafael is not entitled to federal habeas relief on his claim of insufficient evidence as to the murder.

### b. Attempted Murder

Rafael claims that there is insufficient evidence to support his conviction for attempted murder of Herrera because there is no evidence that he aided or

15

abetted Jesus' shooting Herrera. Specifically, Rafael contends that there was no evidence that he knew Herrera was at the scene, no evidence that he knew what Jesus was doing, and no evidence that he acted with intent to shoot Herrera. According to Rafael, he "committed no act which contributed to Herrera's shooting. Jesus was the only one who shot Herrera. Rafael's guilt was entirely vicarious." He concludes, "[i]f there is any basis for finding Rafael's culpability to be greater than Jesus', it must be grounded on some 'mitigating factor applicable only to the actual perpetrator.'" Rafael cites People v. McCoy, 25 Cal. 4th 1111, 1116 (2001) and Mitchell v. Prunty, 107 F.3d 1337 (9th Cir. 1997).

The California Court of Appeal rejected the claim as follows:

> "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages, or instigates the commission of the crime." People v. Cooper, 53 Cal.3d 1158, 1164 (1991).

> Both Rafael and Jesus owned guns, and the evidence supports a finding that each knew the other had one. Indeed, on occasion, Rafael kept Jesus's gun at his apartment. On September 25, 2000, Rafael shot at suspected Norteños in a truck. Jesus knew about the shooting. On October 28, 2000, Rafael and Jesus went out looking for Norteños and aggressively confronted Rosillo, whom they suspected of being a Norteño. There was evidence Jesus held a gun at his side. On October 29, 2000, Rafael and Jesus went out again into a Norteño area to look for Norteños, and Rafael was ready to use his gun if necessary. Under the circumstances, the jurors could reasonably infer that on October 29, 2000, both Rafael and Jesus were ready and willing to support each with guns against Norteños.

> On that night, Rafael and Jesus encountered Reyes and David Griego, who were standing near Herrera's car, and Herrera, who was inside listening to music with the windows down. Jesus said there were more than two men. Thus, the jurors could reasonably infer that Rafael too was aware of Reyes, Griego, and Herrera. The evidence further reveals that after Rafael started shooting, Jesus

16

started, and both were shooting at the same time. Under the circumstances, the jury reasonably could further infer that Rafael knew Jesus was shooting at someone, and Rafael continued to empty his gun at Reyes intending not only to kill Reyes but also by example to encourage and facilitate Jesus to do the same to Herrera. See People v. Campbell 25 Cal.App.4th 402, 409 (1994) (presence at scene, companionship, and conduct before and after offense relevant in determining liability as an aider and abettor).

We acknowledge that Rafael was convicted of attempted premeditated murder but Jesus was convicted of only attempted murder. However, as Rafael concedes, there is no legal bar against convicting an aider and abettor of one offense and the direct perpetrator of a lesser offense. As the court in People v. McCoy, 25 Cal.4th 1111, 1120 (2001), stated, "[i]f the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." Here, the verdicts indicate, in essence, a finding that Rafael was acting with a particular motive, premeditated intent, and purpose on October 29, 2000, and Jesus went along without the same motive, premeditation, and purpose but with a general intent to support Rafael. Accordingly, Jesus aided and abetted Rafael in shooting at Reyes; he shot at Herrera with express or implied malice; but, in general, he did not act that night with premeditation and deliberation. In our view, the record supports the distinction implicitly drawn by the jury between Rafael and Jesus. There is no evidence that Jesus acted as aggressively or provocatively toward Norteños as Rafael did; no evidence that he had his own reasons for seeking out suspected Norteños; and relatively little evidence of planning on Jesus's part.

Rafael's reliance on Mitchell v. Prunty, 107 F.3d 1337 (9th Cir. 1997) is misplaced. The facts in Prunty, as summarized by defendant, are entirely different from those here and did not involve the nearly simultaneous shooting by two perpetrators at two different victims.

As with his claim concerning the killing of Reyes, Rafael also claims there is insufficient evidence of premeditation and deliberation in connection with the attempted murder of Herrera. We disagree. The evidence of Rafael's planning and motive,

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> summarized above, and the fact that he enlisted Jesus to assist him
> supports a finding of premeditation and deliberation in connection
> with directly shooting at suspected Norteños or aiding and abetting
> Jesus.

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at **20-24 (emphasis in original).

The California Court of Appeal did not unreasonably apply Jackson to the facts of this case. See 28 U.S.C. § 2254(d); Juan H., 408 F.3d at 1275. A rational trier of fact could have found proof beyond a reasonable doubt that Rafael, by his act or advice, and "with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of the crime, . . . aid[ed], promote[d], encourage[d], or instigate[d]" the shooting of Herrera. People v. Cooper 53 Cal. 3d at 1164. That is all that Jackson requires. See Jackson, 443 U.S. at 319. Rafael is not entitled to federal habeas relief on his claim of insufficient evidence as to the attempted murder.

## 2. Exclusion of Evidence

State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Holmes v. South Carolina, 126 S. Ct. 1727, 1731 (2006); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant's right to present all relevant evidence); Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to present his defense is constrained by established rules of evidence and procedure). This latitude is limited by a defendant's constitutional rights to due process and to present a defense–rights originating in the Sixth and Fourteenth Amendments. See Holmes, 126 S. Ct. at 1731; Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (holding that the Sixth Amendment affords an accused in a criminal trial the right to present a defense). Due Process "requires that criminal

18

1
2
3
4

prosecutions comport with prevailing notions of fundamental fairness and that criminal defendants be afforded a meaningful opportunity to present a complete defense." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quotations and citations omitted).

5
6
7
8
9
10
11
12
13
14
15

"While the Constitution [] prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 126 S. Ct. at 1732; see Egelhoff, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental"). The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule is so rooted. Id. at 47.

16
17
18
19
20
21
22
23
24

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, a federal habeas court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. See Chia, 360 F.3d at 1006; Miller v. Stagner, 757 F.2d 988, 995 (9th Cir. 1985).

25
26
27

Finally, even if the exclusion of evidence amounts to a violation of due process, habeas relief may be granted only if the error had a substantial and

28

19

injurious effect on the verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). In other words, the error must have resulted in "actual prejudice." Id.

### a. Reyes' Gang Affiliation

Petitioners jointly argued to the California Court of Appeal and jointly argue here that the trial court erred in excluding evidence of Reyes' gang affiliation, and that this exclusion violated their Sixth Amendment rights. Petitioners specifically argue that this evidence was relevant to corroborate Petitioners' story because, as a Norteño gang member, Reyes had a reason to act aggressively toward strangers, and particularly Rafael, a Sureño. This, Petitioners contend, made it more likely that Reyes did in fact act in conformity with that character on the night of the murder, thereby bolstering Petitioners' imperfect self-defense claim. Petitioners argue that without this evidence, the jury was left with an "improperly sanitized version" of Reyes' character, which permitted the prosecutor to create an unfair juxtaposition between the posture of Petitioners as "gangster thugs," and Reyes as an innocent person celebrating his birthday.

The record shows that evidence of Reyes' gang affiliation was offered in three forms, all of which the trial court rejected. The first was the testimony of Diane Griego, who testified at trial that: (1) she did not know what a Norteño is; (2) Reyes was a peaceful, nonviolent person who was not a Norteño gang member; and (3) she did not tell anyone that Reyes used to associate with Norteños. The defense sought to impeach Diane with her prior inconsistent statements to police that Reyes "used to associate with Norteños."

The second form of evidence of Reyes' gang affiliation was statements made by David Griego, who had told police that Reyes told him he was part of the "San Jose Sharks," or that "he started the gang," and "was down for anything to do with Norte." The third was statements by Herrera to police that Reyes told

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

him that he was a member of the East Side Sharks–presumably a Norteño gang. Petitioners argued that these statements were admissible hearsay as statements against interest.

The trial court considered and ruled on the admissibility of the evidence. First, the court found the evidence irrelevant. Given that the issue in establishing the defense of imperfect self-defense was whether Petitioners had a genuine belief that they were in danger, the court reasoned that evidence that supported the reasonableness of that belief was irrelevant. Evidence that Reyes actually *was* a Norteño might make Petitioners' belief more reasonable, but not necessarily more *honest*. The court reasoned that the Petitioners could testify that they believed that Reyes was a gang member and that they might be attacked, and that this was sufficient given that the beliefs of Petitioners were what was at issue. The trial court also determined that the evidence was irrelevant because Reyes' affiliation with a Norteño gang did not necessarily establish that he acted in an aggressive or threatening manner on a particular occasion.

The trial court also reasoned that the statements were hearsay. As to the statements allegedly made by Reyes to David and Herrera, the court found that the statements against interest exception did not apply because Reyes' statements–made to a family member and a close friend–were not against his penal interest because they did not tend to subject him to criminal or civil liability, and were not against his social interest because they did not tend to "mak[e] him an object of hatred, ridicule, or social disgrace in the community." Cal. Evid. Code § 1230. The court noted that such statements were actually made to enhance Reyes' status in the eyes of the family and friends with whom he spoke. The trial court excluded the statements made to David and Herrera as more prejudicial than probative under Evidence Code section 352. As to the statements offered to impeach Diane, the trial court ruled that their admission

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

would only constitute impeachment on a collateral issue.  The court excluded the statements as more prejudicial than probative.  See Cal. Evid. Code § 352.

Finally, the trial court noted that its exclusion of evidence of Reyes' gang affiliation was ameliorated by the fact that it was admitting as character evidence testimony from Reyes' father that Reyes "liked to fight and would not back down if provoked," and testimony from Dolores Calsadillas, Reyes's ex-girlfriend, that Reyes was a verbally aggressive, verbally abusive, and violent man, who liked to fight.

Petitioners argued to the California Court of Appeal that exclusion of evidence of Reyes' gang membership rendered their trial fundamentally unfair because it inhibited their ability to establish their defense of imperfect self-defense.  According to Petitioners, their defense of imperfect self-defense–that they had an honest albeit unreasonable belief that their lives were threatened and that they needed to use deadly force to protect themselves–depended upon persuading the jury that they were telling the truth about Reyes' aggressive words and movements.  They contend that offering evidence that Reyes was a Norteño makes it more likely that Reyes would use the term "scrapa" and make it more likely that he would act aggressively toward them.  They argue that such evidence "would have provided the missing explanation for Reyes' motive[s]," and that its exclusion left the jury with no understanding for why Reyes would do the things Petitioners claim he said and did.

Petitioners further argued that this evidence was critical because David, the only other person close enough to hear anything Reyes said, testified that Reyes' statements were innocuous and unprovocative.  Petitioners argue that because what Reyes said to Petitioners as they walked by was in serious dispute, and because their apprehension of Reyes went to the heart of their defense,

22

exclusion of evidence that made it more likely that Reyes would act with hostility toward them rendered their trial fundamentally unfair.

After considering the rationale of the trial court and Petitioners' arguments, the court of appeal affirmed the conclusions of the trial court. The court noted that while the opinions of Reyes' father and Calsadillas fit the definition of character evidence under Section 1103(a)(1),

> evidence of Reyes's gang membership – whether in the form of his own statements to this effect, his reputation for being a member, or an opinion that he was a member – does not, by itself, describe a character trait. It merely establishes the fact of membership, and, as the court in People v. Perez, 114 Cal. App. 3d 470, 477 (1981), opined, "Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion[]."

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at **29-30 (emphasis in original). The court of appeal rejected Petitioners' assertion that "gang membership reflects a character trait because it is a matter of 'common knowledge' that Norteño gang members are aggressive and violent toward Sureños." First, the court noted that "[c]ourts have rejected the notion that evidence of gang's criminal acts has a tendency to prove how a particular gang member acted on a particular occasion." Id. at *30 (citations omitted). Second, the court stated that,

> although it may be common knowledge that there are gangs and they fight with each other, the sociology, psychology, habits, symbols, motives, and activities of criminal street gangs are, in our view, matters beyond common knowledge and understanding. Indeed, where such information is necessary to an understanding of the issues in a criminal prosecution, it is usually provided by a gang expert.

Id. at *31 (citations omitted).

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The court of appeal concluded that Rafael's "anecdotal testimony concerning acts by other suspected Norteños does not support a reasonable inference that all, most, or even a substantial number of . . . Norteño gang members . . . engage in similar conduct or share particular character traits for aggression and violence." Id. at *32. The court also affirmed the trial court's determination that any probative value to be gained by the evidence "was outweighed by its potentially inflammatory impact and tendency to trigger speculation about Norteños and Norteño gangs." Id. at *34.

As to Diane's statement to police that Reyes "used to associate with Norteños" offered for purposes of impeachment, the court of appeal found its potential for prejudice high and its probative value weak given its vague nature.[6] It also found that the issue of whether she in fact ever did tell anyone that Reyes was a Norteño to be a collateral matter. Id. at **34-35.

Finally, the court of appeal found that the statements Reyes made to David and Herrera were inadmissible hearsay because they did not meet the definition of statements against interest under Evidence Code section 1230. First, the court concluded that Reyes did not risk criminal liability by telling his nephew and friend that he was a gang member because membership is not by itself a crime. See Cal. Penal Code § 186.22(a) (making it a crime to "actively participate[]" in a "criminal street gang" with knowledge that its members have "engaged in a pattern of criminal gang activity, and willfully promote[], further[], or assist[] in any felonious criminal conduct" by other gang members). Second, "the court could have reasonably concluded that when Reyes allegedly claimed gang membership to his nephew and friend, there was no risk it would make him the

---

[6] "Diane Griego's statement to police that Reyes "used to associate with Norteños" . . . is vague. It does not describe conduct, and it could mean that Reyes was no longer associating when he was killed. Thus, it had no tendency to prove his conduct that night." People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at *34.

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

object of hatred, ridicule, or social disgrace in the community." People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at *39. Finding no abuse of discretion, the court of appeal affirmed the trial court's rulings. Id. at *40.

Petitioners argued to the California Court of Appeal, as they argue here, that exclusion of evidence of Reyes' gang affiliation violated their federal constitutional right to present a defense. The court rejected their claim on the ground that Petitioners could assert their defense notwithstanding the exclusion of evidence of Reyes' gang affiliation. The court explained:

> The defense was based on the theory of imperfect self-defense – that defendants had an honest but unreasonable belief in the need to use deadly force to protect themselves. As the trial court observed, the crucial question was whether defendants actually believed they needed to defend themselves. To this end, they testified that Reyes acted aggressively toward them, and they thought they needed to defend themselves. To support their testimony, they presented evidence that Reyes was a violent, aggressive, and abusive person, who liked to fight. Thus, the record reveals that defendants were able to present their defense.
>
> Moreover, as the People note, a defendant's constitutional right extends only to the presentation of relevant and material evidence. Washington v. Texas, 388 U.S. 14, 23 (1967); People v. Babbitt, 45 Cal.3d 660, 684 (1988); People v. Reeder, 82 Cal. App. 3d 543, 553 (1978). Unless a particular rule of evidence is itself unconstitutional, a court's evidentiary rulings do not, as a general matter, impermissibly infringe on the accused's right to present a defense. People v. Boyette, 29 Cal.4th 381, 414 (2002). Rather, courts retain "a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." People v. Hall, 41 Cal.3d 826, 834 (1986). Thus, here, the exclusion of evidence concerning Reyes' gang membership because it was irrelevant, more prejudicial than probative, and inadmissible hearsay did not violate defendants' constitutional rights.

25

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at **40-42. Even if

error occurred, the court concluded that it was harmless:

> Defendants introduced evidence that Reyes had a propensity to be
> violent, aggressive, abusive and that he liked to fight, which
> bolstered Rafael's testimony about Reyes's conduct and thus
> supported the defense. For this reason, we disagree with
> defendants' assertion that without the gang evidence, the jury was
> left with the erroneous impression that they simply gunned down an
> innocent person during his birthday celebration. On the other hand,
> Rafael's credibility was substantially undermined by the many lies
> and stories he fabricated to avoid liability for his conduct.
> Moreover, there was compelling evidence that Rafael had a
> propensity to be provocative, aggressive, and violent and to use his
> gun against suspected Norteños. There was strong evidence that on
> the night of the incident, he was motivated by a desire for revenge
> and retaliation against them. It is undisputed that he armed himself,
> enlisted Jesus's assistance, and went looking for Norteños. And,
> after encountering Reyes, Rafael emptied his gun into Reyes, which
> accounted for only some, but not all, of the bullet wounds he
> suffered. Moreover, Reyes was not armed, and there was evidence
> that Rafael continued to shoot him when he was on the ground
> trying to defend himself.[7] Under the circumstances, we do not find
> it reasonably probable the jurors would not have found
> premeditation, deliberation, and malice and instead convicted
> Rafael or Jesus of voluntary manslaughter if they had learned about
> Reyes's alleged gang membership. As discussed above, that
> evidence, by itself or even supplemented with Rafael's anecdotal
> testimony about specific acts by other people, had little, or no,
> reasonable tendency to prove Reyes's conduct on the night he was
> killed. Under the circumstances, any alleged error in excluding it
> was harmless.

Id. at **44-45 (footnote in original, footnote number altered, citation omitted).

_____

> [7]In this regard, we note that the court instructed the
> jury that "the right of self-defense exists only as long
> as the real or apparent threatened danger continues to
> exist. When the danger ceases to appear to exist, the
> right to use force in self-defense ends."

26

1

2

3

4

5

6

7

8

9

10

The California Court of Appeal's rejection of Petitioners' exclusion of evidence claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d); see also Egelhoff, 518 U.S. at 42 (finding that relevant evidence may be excluded without violating due process if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence).

Petitioners' reliance on Chambers v. Mississippi does not compel a different conclusion. The California Court of Appeal explained:

11

12

13

14

15

16

17

18

19

20

21

Defendants' reliance on Chambers v. Mississippi, 410 U.S. 284 (1973) and People v. Mizchele, 142 Cal. App. 3d 686 (1983) is misplaced. In Chambers, a man named MacDonald signed a confession to the crime, for which the defendant was being prosecuted, and also made inculpatory statements. However, at trial, the defense called him as a witness, but he repudiated his confession and denied involvement in the crime. Applying Mississippi's rules of evidence, the trial court precluded the defense from impeaching its own witness directly or by presenting witnesses either to discredit his repudiation or demonstrate his complicity via MacDonald's hearsay statements against penal interest. The United States Supreme Court held that the combined effect of the rules and rulings operated to foreclose the presentation of potentially exculpatory evidence crucial to the defense and thus deprived the defendant of due process. Chambers v. Mississippi, 410 U.S. at 302.

22

23

24

25

26

27

In Mizchele the defendant and his wife argued, and she was shot. The defendant denied that he intentionally shot her. He testified that she had a gun in her jacket, which she had brandished at him in the past. He said he picked up her jacket, removed the gun, and somehow it discharged accidentally. To support his defense, defendant attempted to introduce previous specific acts of aggression involving the use of weapons by his wife. Id. at 688-89.) On appeal, the court held that the evidence was admissible under section 1103 and that the exclusion violated the defendant

28

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> constitutional right to present a defense, in that it supported his claim that he retrieved the gun for a purpose other than to shoot his wife. Id. at 690-91.
>
> In our view, the exclusion of Reyes's gang membership is not comparable to the exclusion of highly probative evidence of third-party culpability in Chambers or the erroneous exclusion of specific acts of aggression by the victim against the defendant in Mizchele. Thus, those cases are distinguishable.

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at **42-43. The court of appeals' reasoning in distinguishing the facts of this case from those in Chambers was not objectively unreasonable. Evidence that Reyes was a gang member was not potentially exculpatory in the same manner as the strong evidence of a third party's guilt was in Chambers.

Application of the factors identified in Chia v. Cambra support this conclusion. See Chia, 360 F.3d at 1004. First, the probative value of the excluded evidence on the central issue was minimal because under California law, membership in an organization does not establish action in conformity therewith on a given occasion. See Perez, 114 Cal. App. 3d at 477; see also Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (rejecting habeas claim on basis of California law that gang membership does not reasonably lead to any inference as to the conduct of any member on a single occasion). Second, the statements Reyes made in the confidence of family and friends were probably reliable. Third, gang behavior and psychology are not easily capable of evaluation by the trier of fact. Fourth, even if relevant to prove his aggressiveness on a given occasion, evidence of Reyes' gang affiliation was not the sole evidence on the issue but merely cumulative because Calsadillas and Reyes' father had testified that Reyes was aggressive and liked to fight. And fifth, the central or major part of the imperfect self-defense was what Petitioners believed about the danger they faced from Reyes, and not the reasonableness of

28

1   that belief. The fact that Reyes was allegedly a member of a gang – a fact that

2   Petitioners could not be sure of at the time–speaks more to reasonableness and

3   less to the honesty of Petitioners' beliefs–something to which they themselves

4   were better apt to testify. On balance, the factors do not indicate that the

5   exclusion of evidence of Reyes' gang affiliation violated Petitioners'

6   constitutional rights. See Chia, 360 F.3d at 1004-06. The Court is satisfied that

7   federal habeas relief is not warranted on this claim. See 28 U.S.C. § 2254(d).

8                            ***b. Reyes' Prior Threats***

9          At trial, Petitioners sought to have Calsadillas testify that after the end of

10  her relationship with Reyes, Reyes repeatedly called her on the phone threatening

11  to kill her and her family. The trial court found evidence of the victim's violent

12  character was relevant to Petitioners' defense of imperfect self-defense and

13  admissible under Evidence Code section 1103(a)(1). However, it limited

14  Calsadillas' testimony regarding Reyes' violent character to opinion testimony

15  that Reyes was a violent, verbally abusive and aggressive person, who liked to

16  fight. The trial court excluded evidence of Reyes' specific prior threats toward

17  his ex-girlfriend Calsadillas on hearsay grounds and also as being more

18  prejudicial and probative under Evidence Code section 352.

19         The California Court of Appeal disagreed with the trial court, finding that

20  the statements Reyes made to Calsadillas were admissible as character evidence

21  under section 1103(a)(1) to show Reyes' propensity for violence, and not hearsay

22  because they were not being offered to prove the truth of the statements, but to

23  show the state of mind of the declarant. See People v. Dennis, 17 Cal. 4th 468,

24  528 (1998) (a threat not offered to prove its content but to show the declarant's

25  state of mind is not within the hearsay rule). However, the court of appeal found

26  that the trial court did not abuse its discretion in deciding not to admit the

27  threatening statements under section 352. The court explained:

28                                       29

Having ruled admissible testimony by three witnesses, including Calsadillas, that Reyes was an aggressive, abusive, and violent man who liked to fight, the court could reasonably conclude that additional character evidence in the form of his numerous threats to kill Calsadillas was not only cumulative but less probative of conduct than the opinion evidence, in that Reyes's threats were made in circumstances completely different from those the night of the killing. In particular, the threats were made after a domestic relationship had disintegrated; Calsadillas had custody of their child; and she had obtained a restraining order. Such a conclusion would be particularly appropriate insofar as Calsadillas would have testified that Reyes threatened to shoot her and her family because there was no evidence Reyes had a weapon the night he was killed. Indeed, Jesus concedes that there was a plausible reason to exclude evidence of another threat Reyes made to shoot up someone's house. In sum, the court could have reasonably concluded that the probative value of the evidence was outweighed by the potential for the evidence to consume an undue amount of time and divert the jury's attention to Reyes's relationship with Calsadillas and the circumstances under which he threatened her.

People v. Preciado, 2004 Cal. App. Unpub. LEXIS 4588 at **48-49 (emphasis in original).

The court further found that any error in excluding evidence of the threats against Calsadillas was harmless:

Simply put, the jury learned that Reyes was a violent, aggressive, abusive man who liked to fight, and it is not reasonably probable the jury would have reached a verdict more favorable to defendants had they learned that Reyes had threatened to kill Calsadillas after their relationship ended.

Id. at **49-50 (footnote and citation omitted).

The California Court of Appeal's rejection of Petitioners' exclusion of evidence claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d). In view of the evidence presented at trial, it simply cannot be said that excluding evidence

30

1    of the threats against Calsadillas had a substantial and injurious effect or

2    influence in determining the jury's verdict. <u>See</u> <u>Brecht</u>, 507 U.S. at 637.

3    Petitioners are not entitled to federal habeas relief on this claim.

### CONCLUSION

5         For the foregoing reasons, the petitions for a writ of habeas corpus are

6    DENIED. The clerk shall enter judgment in favor of the respondent in both

7    cases, terminate all pending motions as moot, and close the files.

9    **SO ORDERED.**

10   DATED: _November 17, 2006_

11                                    CHARLES R. BREYER
                                      United States District Judge
12

31